**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ANDREY CHUN SARMIENTO,**<br>**also known as**<br>**ANDREY CHUN,**<br><br>    **Defendant.** | **CRIMINAL NO. 24-CR-108 (LLA)** |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF
PRETRIAL DETENTION OF DEFENDANT ANDREY CHUN SARMIENTO**

In February 2024, Defendant Andrey Chun Sarmiento used an encrypted messaging application to send an undercover law enforcement agent a link to hundreds of videos of child pornography, many of which depict men raping prepubescent boys. Describing himself to the undercover agent as a "huge pedo," Defendant claimed that, when he was in high school a few years ago, he sexually abused a nine-year-old cousin. At the time of the charged offense, Defendant was enrolled in law school in Harrisburg, Pennsylvania. He lamented that it was "[h]ard to find boys here now," that he had found "no boys yet sadly," that he wished he had "played with [his] lil cousin more," and that he wished he were bisexual so he could meet "a single woman with sons." He also claimed to have met up with other men to watch child pornography and masturbate.

A federal grand jury indicted Defendant on one count of distribution of child pornography, in violation of Title 18, United States Code, Section 2252(a)(2). The United States respectfully submits this memorandum in support of its motion that Defendant remain detained pending trial pursuant to Title 18, United States Code, Sections 3142(f)(1)(A) (crime of violence) and 3142(f)(2)(A) (risk of flight). Because Defendant poses an unmitigable risk to community safety and is a flight risk, this Court should order that he remain detained pending trial.

**Factual Background**

Leading up to Tuesday, February 13, 2024, a member of the MPD–FBI Child Exploitation and Human Trafficking Task Force (the "UC") was acting in an undercover capacity from an office located in the District of Columbia.  In that capacity, the UC was active on "Grindr," a geolocation-based social networking and online dating application geared toward gay and bisexual men.  The application is available for smartphones running the iOS and Android operating systems and can also be accessed through a web browser.  It allows users to create a profile and use their GPS location to place their profile on a grid, where they can browse, and be viewed by, other nearby users.  Users can view profiles of users that are farther away by applying filters (e.g., age, height, weight) or by using the "Explore" feature, which allows users to type in an address and view other users located in that geographic area.  The "grid" displays the profiles as squares containing a thumbnail of the user's profile picture and the user's display name.  The profiles are sorted by distance, with profiles of nearby users at the top of the grid.  Selecting a profile from the grid will open the user's full profile and photos.  From there, a user can interact with the other user in many ways, to include sending private messages, sending pictures and videos, making video calls, and sharing one's precise location.

On Tuesday, February 13, 2024, the UC received an unsolicited message from a Grindr user with the display name "AC" (i.e., Defendant's initials), later identified as Defendant.  Defendant's profile contained three photos, all of which showed his face.  It also stated that he was 95 miles away.[1]   Defendant messaged the UC using Grindr's "Explore" feature, which, as discussed above, allows users to search for other users in particular geographic areas.  The message

---

[1] The aerial distance between the UC's office in the District of Columbia and Defendant's then-residence in Harrisburg, Pennsylvania, is approximately 95 miles.

said, "Hey there no lims[2] here" and included a devil with horns emoji, a pizza emoji,[3] and a football emoji.[4]   The UC responded stating, "None here," and "Total bi perv[5] dad."   Defendant responded "Fuck yeaaa" and asked the UC if he had Session.   The UC provided the alphanumeric code for his Session account.



*Defendants's Conversation with the UC on Grindr*

---

[2] "No lims" is short for "no limits" and means just that—no limits.  It is a phrase commonly used by individuals with illicit sexual proclivities, including incest, the sexual abuse and exploitation of children, and child pornography.

[3] The pizza emoji functions as a code for child pornography, as "cheese pizza" shares its initials with "child pornography."  The use of the pizza emoji as code for child pornography has also been discussed in media accounts of online child exploitation.  *See, e.g.*, Jeff Horwitz & Katherine Blunt, *Instagram Connects Vast Pedophile Network*, Wall St. J. (June 7, 2023, 7:05 a.m.), https://www.wsj.com/articles/instagram-vast-pedophile-network-4ab7189   ("Certain emojis function as a kind of code, such as an image of a map—shorthand for "minor-attracted person"— or one of "cheese pizza," which shares its initials with "child pornography[.]").

[4] The football emoji is an apparent reference to Matthew Estes, a high-school football player who produced videos that depicted him raping a minor boy.

[5] Individuals interested in the sexual abuse and exploitation of children and in child pornography often refer to themselves and their proclivities using the term "perv" and variants thereof.



*Defendant's Grindr Profile Photos*

Upon receiving the UC's alphanumeric code, Defendant began messaging with the UC on

Session, where he was using the username "Pervybois."  The following is a portion of the chat:

**Defendant:** Hey perv

**UC:** Hey

**UC:** What's your situation

**UC:** Any experience with young

**Defendant:** Yea a few years ago in high school I used to play with my 9yo[6] cousin.
He sucked me off and he let me suck and rim[7] him.

---

[6] The initials "yo" stand for "years old."

[7] "Rim" is a vulgar slang term for performing oral sex upon an individual's anus.

**Defendant:** Hard to find boys here now

**Defendant:** What about you?

**UC:** That's so hot!

**UC:** I play with my gf boy he is 7 and she has a baby boy too ,

**Defendant:** Yeah I wish I took advantage of it more looking back. I didn't realize I was turning to a huge pedo[8]

**Defendant: [replying to "I play with my gf boy he is 7 and she has a baby boy too ,"]** Fuckk yeaaa

**Defendant:** That's fucking hot

**UC:** I am divorced with an 8 yo daughter and an only play with her when she sleeps

**UC:** Where you located near DC?

**Defendant:** I wish I were bi so I can find a single woman with sons

**Defendant:** Eh im in pa

**Defendant:** Like an hour from the dc area

**Defendant:** Wbu?[9]

**UC:** lol, yeah they are hard to find

**Defendant:** I'm from DC tho

**UC:** I am in DC

**Defendant:** Fuck yea, maybe we could hang out sometime.

**Defendant:** What do you do with your gf son?

**UC:** Love to

---

[8] "Pedo" is short for pedophile.

[9] "Wbu" is Internet slang for "What about you?"

5

**UC:** Suck his dick , rub cock on him, cum on him, lick his hole, use his hand to jerk

**Defendant:** Fuckkk yea that's fucking hot. I wish I played with my lil cousin more.

**Defendant:** Where in the DC area you from?

**UC:** Yeah, I love it , makes my hear race every time **[Defendant reacted to this message with a devil with horns emoji]**

**UC:** Right outside of Chinatown,

**UC:** I have perv bated[10] to some cp[11] with some local pervs,

**UC:** What about u

**Defendant:** Okay nice, yeah I know that area well. Used to live in Capitol Hill and Alexandria too. I've met some here but all flakes or too scared to meet up. Once in Florida on a trip, I bated to cp with a couple of guys.[12] It was so fucking hot. But this area kind of sucks.

**UC:** Yeah, it's hot as hell. Only did it a few times , both were out of town pervs

**Defendant:** But no boys yet sadly. I was chatting with a 17 yo but he was a flake and only wanted to pnp[13]

**Defendant:** Yea, maybe we could link up when I'm back visiting some of my buddies in Va.

**Defendant:** I trade mega[14] links too

---

[10] "Bated" is a slang term that is short for "masturbated."

[11] The initials "cp" stand for child pornography.

[12] Uber has produced records for Defendant's account that may corroborate this claim. On December 22, 2023, at approximately 11:00 p.m., Defendant took a roughly 28-mile Uber ride from a Walt Disney World Resort hotel in Lake Buena Vista, Florida, to a residence in Winter Park, Florida, where he stayed for approximately one hour before returning by Uber to his hotel.

[13] The initials "pnp," sometimes styled as "PnP," stand for "party 'n' play" and refer to the practice of using recreational drugs during sexual activity.

[14] MEGA is a file hosting/sharing service based in Auckland, New Zealand. The service is end-to-end encrypted and is frequently used to share large quantities of child pornography.

During the course of the chat, Defendant sent the UC a MEGA link and said, "I really only have boy/gay links." The link led to multiple folders containing over 200 video files. One folder was titled "kid" and contained 92 files. Within this folder were numerous videos of prepubescent boys being raped and otherwise sexually abused by adult men. Based on his training and experience, the UC immediately recognized these videos as constituting "child pornography" as that term is defined by Federal law. The majority of the other folders also contained videos depicting prepubescent boys being sexually abused by adult men. The following is a description of a selection of videos from the "kid" folder:

- A video 4 minutes and 55 seconds in length. The video depicts an adult male orally penetrating a prepubescent boy with his erect penis.

- A video 2 minutes in length. The video depicts an adult male anally penetrating a prepubescent boy with his erect penis.

- A video 1 minute and 31 seconds in length. The video depicts an adult male orally penetrating a prepubescent boy with his erect penis.

During the chat, Defendant discussed the possibility of meeting the UC in the future. The UC provided his cellular telephone number. Defendant later texted the UC using a Verizon Wireless number with area code 757. Defendant identified himself as "andy," an apparent variant of his first name. He falsely claimed to be a lobbyist and said he worked at a firm based in Philadelphia and traveled between Pittsburgh and other cities "[t]o meet with clients and talk to legislators." Law enforcement was able to identify Defendant using his telephone number, which he has used since 2016, and determined that he was a third-year law student in Harrisburg.

On March 1, 2024, following his indictment by a federal grand jury, Defendant was arrested at his internship at the Administrative Office of the Pennsylvania Courts in Harrisburg, Pennsylvania. He stated multiple times that he had ruined his life and that his life was over.

**Procedural History**

On Thursday, February 29, 2024, a federal grand jury returned a one-count indictment charging Defendant with a violation of Title 18, United States Code, Section 2252(a)(2), (b)(1) (Distribution of Child Pornography), and the Honorable Robin M. Meriweather issued an arrest warrant the same day.  The case was assigned to the Honorable Loren L. AliKhan.

On Friday, March 1, 2024, FBI agents arrested Defendant in Harrisburg, Pennsylvania, and executed a search warrant at his residence.  Following his arrest, Defendant appeared before the Honorable Susan E. Schwab of the United States District Court for the Middle District of Pennsylvania.  *See* Case No. 24-mj-20 (SES) (M.D.Pa.).  At the initial appearance, the United States moved for pretrial detention.  It was initially anticipated that a detention hearing would be held in the Middle District of Pennsylvania on March 5, 2024.  The defendant then retained counsel and, on March 4, 2024, elected to litigate detention before this Court rather than in the Middle District of Pennsylvania.  Accordingly, Judge Schwab entered an order committing the defendant to the District of Columbia and directing the United States Marshals Service to transfer him here. The defendant consented to detention for the purposes of that transfer.

On March 19, 2024, Defendant had his initial appearance here before the Honorable G. Michael Harvey.  The United States moved for pretrial detention pursuant to Title 18, United States Code, Section 3142(f)(1)(A), as Defendant has been charged with a crime of violence.  A detention hearing was scheduled for April 4, 2024, and later continued to April 15, 2024.  The government now respectfully submits this Memorandum in support of its Motion for Pretrial Detention.

**Applicable Legal Standard**

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of

8

any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466 (D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Here, because Distribution of Child Pornography is a crime of violence involving a minor victim, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th

9

Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts.  Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996).  Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."  *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).  A pretrial detention hearing should not be used as a discovery device.  *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

**Argument**

For reasons that follow, there are no conditions of release adequate to reasonably assure community safety or Defendant's return to Court, and this Court should detain him pending trial.

**A.  Nature and Circumstances of the Charged Offense**

Defendant's alleged conduct in this case is extremely harmful and dangerous to the community.  As detailed above, the nature and circumstances of the present offense make clear

that this factor weighs heavily in favor of detention because Defendant's criminal conduct involves the sexual exploitation of the most vulnerable members of our community – very young children. "Child pornography depicts pictorial evidence of physical sex abuse against and exploitation of children and the production and distribution of such contraband carries a multitude of harms." *United States v. Galarza*, No. 18-MJ-146 (RMM), 2019 WL 2028710, at \*6 (D.D.C. May 8, 2019) (Howell, C.J.) (reversing magistrate court's release order); *United States v. Nickelson*, No. 18-MJ-102 (GMH), 2018 WL 4964506 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same); *United States v. Blanchard*, No. 18-MJ-101 (GMH), 2018 WL 4964505, at \*4 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same).  Children captured in images and videos depicting their sexual abuse are significantly harmed at the time that the images and videos are created, and they are re-victimized and re-traumatized every time an individual, like Defendant, views and shares these images for his own sexual gratification and for the sexual gratification of others. *See Galarza*, 2019 WL 2028710, at \*6 (noting that "'the perpetual nature of child pornography distribution on the Internet causes significant additional harm to victims,' [who] 'live with persistent concern over who has seen images of their sexual abuse' and how those images are being used to cause additional harm.'" (quoting U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES (Dec. 2012) at vii); *Nickelson*, 2018 WL 4964506, at \*4 (same); *Blanchard*, 2018 WL 4964505, at \*4 (same).

The seriousness of the offense is also reflected by Congress's judgment that those charged with distributing child pornography should be presumed detained pending trial, *see* 18 U.S.C. § 3142(e)(3)(E), and are subject to a five-year mandatory minimum term of imprisonment upon conviction, *see* 18 U.S.C. § 2252(b)(1).

Defendant's conduct in this case was particularly egregious in that it involved the distribution of hundreds of videos depicting the rape and sadistic sexual abuse of prepubescent

boys.  Indeed, the Sentencing Guidelines recognize the serious nature of the offense that Defendant is charged with, which include offense-level enhancements for material involving a prepubescent minor, *see* USSG §2G2.2(b)(2), and material that portrays sadistic or masochistic conduct or sexual exploitation of an infant or toddler, *see* USSG §2G2.2(b)(4).  The Guidelines provide additional enhancements for engaging in the knowing distribution of such material, *see* USSG §2G2.2(b)(3)(F), for using a computer or interactive computer service to do so, *see* USSG §2G2.2(b)(6), and for the number of images, *see* USSG § 2G2.2(b)(7)(D).  Based on the evidence available at this early stage of the case, the United States estimates Defendant's total Offense Level under the Guidelines to be at least 37, yielding an estimated Guidelines range of 210 to 262 months' imprisonment (i.e., approximately 17.5 to 22 years' imprisonment), which further reflects the very serious nature of the offense conduct.[15]  Accordingly, the nature and circumstances of Defendant's offense weigh heavily in favor of detention.

## B.  The Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also weighs heavily in favor of detention.  The evidence against Defendant in this case is extremely strong.  As detailed above, Defendant discussed his sexual interest in children at length with an undercover law enforcement agent and then purposefully distributed a link to the UC containing hundreds of videos depicting the rape and sadistic sexual abuse of prepubescent boys.  Although Defendant distributed the material using an encrypted messaging application, he corresponded with the UC both before and after the offense using accounts that clearly belonged to him—first from a Grindr profile bearing his initials and three profile pictures that show his face, and then from a phone number that has

---

[15] The mandatory-minimum term of imprisonment and lengthy Guidelines range provide incentive for Defendant—who has never previously served a term of imprisonment—to flee prosecution.

been subscribed to him since September 2016.  After he was arrested, Defendant made numerous spontaneous utterances about having ruined his life.

While some judges in this Court have indicated that this factor should be given less weight, in *United States Blackson*, following a thorough review of the text of Section 3142 and decisions analyzing this factor, then–Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors."  No. 23-CR-25 (BAH), 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023) (Howell, J.).  Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate."  *Id.* at *10.  In an unpublished opinion, the D.C. Circuit affirmed then–Chief Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).  The Second Circuit reached the same decision after a thorough and careful analysis of the issue.  *United States v. Zhe Zhang*, 55 F.4th 141, 149–150 (2d Cir. 2022).  This Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true."  *Blackson*, 2023 WL 1778194, at *10.  This is such a case, and Defendant should be detained pending trial.

### C.  The History and Characteristics of the Defendant

Although Defendant has no known criminal history, he has admitted to the undercover officer in this case that he has a long-standing sexual interest in children and claims to have acted on this sexual appetite in the past.  Specifically, Defendant claimed that, when he was in high

school, he sexually abused a nine-year-old cousin. He made statements that indicate he is still interested in sexually abusing children, lamenting that it was "hard to find boys" in Harrisburg. He also stated that he wishes he were bisexual so he could "find a single woman with sons."

In addition, Defendant sought to conceal his illegal distribution of child pornography by using an end-to-end encrypted messaging application.  His conduct is concerning because he was obviously conscious that the distribution pornography is unlawful and, after taking relatively sophisticated steps to make his illegal conduct harder to detect, engaged in it anyway.

Finally, Defendant committed this crime while a third-year law student.  He likely would have sought admission to the bar later this year.  The commission of any crime by a lawyer (or would-be lawyer) is an aggravating circumstance.  *See, e.g.*, *United States v. Mangone*, 652 F. App'x 15, 17 (2d Cir. 2016) (observing that it is a "legitimate view that [a defendant]'s status as a member of the bar [i]s an aggravating circumstance").

This factor also weighs in favor of detention.

### D.  The Nature and Seriousness of the Danger to any Person or the Community

The facts and evidence in this case establish that Defendant poses a grave danger to the community.  As discussed above, the distribution of child pornography results in severe mental, emotional, and physical trauma to the children who are victimized by offenders such as Defendant, who seek to achieve sexual gratification through viewing and sharing of images depicting the sexual abuse of children.  Defendant, as a consumer and trafficker of child pornography, furthers the demand for new material depicting the graphic sexual exploitation and sexual abuse of vulnerable children.  It is precisely "[t]hese significant harms and dangers [that] animated the Congress to create the statutory presumption of detention in these cases."  *Galarza*, 2019 WL 2028710, at *7; *Nickelson*, 2018 WL 4964506, at *5 (noting also Congress's creation of significant

14

statutory mandatory minimum penalties); *Blanchard*, 2018 WL 4964505, at *4 (same).

As described above, Defendant here has not only engaged in the distribution of sadistic child pornography depicting the rape of prepubescent boys but has also sought out others who share his sexual interest in children.  According to Defendant's statements to the UC, he has sexually abused at least one boy in the past, is still interested in sexually abusing boys, and has met up with other men to watch child pornography.

Defendant did not give a second thought to sharing hardcore child pornography with a stranger.  He knew his conduct was illegal and committed the offense using an encrypted application.  The totality of his conduct and personal circumstances demonstrates that he is an unmitigable danger to the community and a flight risk.  There is no condition or combination of conditions that could reasonably assure community safety or Defendant's return to Court were he to be released.  This Court should detain him pending trial.

### Conclusion

For the foregoing reasons, the government respectfully requests that this Court order that Defendant Andrey Chun Sarmiento remain detained pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

Dated: April 13, 2024          By:     /s/ *Paul V. Courtney*
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1719
Paul.Courtney@usdoj.gov